J-S29001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TERMINATION OF PARENTAL RIGHTS TO: L.G.L., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.G.L. II, FATHER | : : : : : : | |
| | : | No. 624 MDA 2023 |

Appeal from the Decree Entered March 2, 2023
In the Court of Common Pleas of Lancaster County
Orphans' Court at No. 2021-02035

BEFORE:   MURRAY, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:          **FILED: OCTOBER 2, 2023**

J.L.G. II (Father) appeals from the decree terminating his parental rights to L.G.L. (Child).[1]  Upon review, we affirm.

CASE HISTORY

Child was born in May 2020.  A month prior to Child's birth, the Lancaster County Children & Youth Agency (Agency) learned Child's Mother had tested positive for methamphetamine.  Orphans' Court Opinion, 5/24/23, at 7.  The Agency also learned that in March 2020, Father incurred criminal charges after he was "found to be possession of drugs and a loaded weapon."

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child's "Mother executed a consent to the termination of her parental rights and the adoption of the Child.  She is not a party to this appeal."  Orphans' Court Opinion, 5/24/23, at 7.

*Id.* Child was placed in the Agency's care a few days after he was born. At the time, Father was living with Mother in a motel, and the Agency was concerned that the parents lacked "necessary supplies needed to care for" Child. *Id.* at 8; N.T., 12/1/22, at 32.

The court "found Child to be dependent at the adjudication/disposition hearing held on June 23, 2020." Orphans' Court Opinion, 5/24/23, at 9. The court explained:

> Father's objectives on [C]hild's permanency plan were to improve mental health functioning, to remain free from drugs and misuse of alcohol, to remain crime-free, to remain free of domestic violence, to learn and use good parenting skills, to be financially stable in order to provide for himself and [C]hild, to maintain a home free and clear of hazards for himself and [C]hild, and to maintain an ongoing commitment to [C]hild. (N.T. 6/23/2020 at pages 43 - 45; N.T. 12/1/2022 at page 34; Order of Adjudication dated 06/23/2020 approving Child's Permanency Plan dated 6/01/2020; Child's Permanency Plan dated 06/01/2020).

*Id.*

At multiple review hearings, the court found Father had not complied with his parenting objectives. *Id.* at 11-12. Father's noncompliance was due in part to his incarceration for all but four months of Child's placement. *Id.* at 13.

On July 21, 2021, the Agency petitioned to involuntarily terminate Father's parental rights. On October 5, 2021, the court, "citing delays and inhibitions caused by the COVID-19 pandemic, granted Father an additional three (3) months to work on completing his objectives on [C]hild's permanency plan." *Id.* at 5.

The orphans' court held termination hearings on December 1, 2022, January 19, 2023, and February 9, 2023. The court terminated Father's parental rights by decree entered March 2, 2023.

On April 11, 2023, Father petitioned for leave to appeal *nunc pro tunc* based on his claim that counsel did not receive a copy of the termination decree prior to the 30 day appeal period. Orphans' Court Opinion, 5/24/23, at 6; Father's Brief at 12. The court granted the petition on April 19, 2023. On April 24, 2023, Father filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

ISSUES

Father presents the following issues for review:

1. Whether the Orphans' Court erred in its Decree dated March 2, 2023, that the … Agency had met its burden in proving that Father's parental rights should be terminated when there was evidence he was working on and completing his goals on his child permanency plan throughout the time the child was in custody?

2. Whether the Orphans' Court erred in its decree dated March 2, 2023, that the … Agency had met its burden in proving that Father's parental rights should be terminated and not allow Father additional time to complete the requirements to enable reunification when there was testimony to the progress and efforts that were made towards reunification with [Child]?

3. Whether the Orphans' Court erred in ruling that [Child]'s best interests and welfare would be served by termination of parental rights when there was evidence of a father-child bond?

Father's Brief at 9.

DISCUSSION

We review the termination of parental rights for an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

> [O]ur standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review .... [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (some citations omitted). The petitioner has the burden to provide clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Termination of parental rights is subject to Section 2511 of the Adoption Act. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Under Section 2511, the orphans' court must engage in a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (citations omitted).

Instantly, Father argues "the record does not support the [orphans' court's] conclusion to terminate Father's parental rights to [Child] by clear and convincing evidence." Father's Brief at 15.

The Agency argues otherwise, stating that it presented clear and convincing evidence Father "did not make progress on his child permanency plan in a timely manner and his continued incarcerations prevented him from performing his parental duties and responsibilities." Agency's Brief at 2.

Similarly, Child's guardian *ad litem* (GAL) references the orphans' court's "well–reasoned" opinion in arguing:

The evidence showed [Father] was unable to complete a Child Permanency Plan per the record. His continued incarcerations prevented him from performing his parental duties and responsibilities. The conditions for which placement was necessary in 2020 continue to exist. The termination of parental rights will provide permanency for [Child, and the orphans'] decision should be affirmed.

GAL's Brief at 4-5.

## Section 2511(a)  -  Grounds for Termination

Father's first and second issues pertain to grounds for termination under Section 2511(a).  Father argues the orphans' court erred in terminating his parental rights under Subsections 2511(a)(1), (2), (5), and (8).  However, to affirm the termination of parental rights, this Court need only agree with the orphans' court's decision as to any one subsection of Section 2511(a).  ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We examine Father's challenge under Subsection 2511(a)(2), which provides for termination when

> [t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).  The petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re A.H.***, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).  Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." ***Id.*** (emphasis added).  Pertinently, the Pennsylvania Supreme Court has held

- 6 -

incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2), where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

***Adoption of S.P.***, 47 A.3d at 828.

Here, the orphans' court addressed Section 2511(a)(2), stating:

Father has not provided care for the Child necessary for the Child to flourish at any time during the Child's entire life. The parenting capacity evaluator was firm and convincing in her conclusion that Father is not able to parent the Child. Sadly, it is apparent Father can barely take care of himself. By his own testimony, Father left four minor children behind when he relocated to Pennsylvania. There were indications of involvement with a child welfare agency in respect to Father's other children. At the same time, there was no testimony to suggest that Father successfully parented any of his at least twelve children (and perhaps 26) who preceded the Child.

\*\*\*

Father's continuous parental incapacity has and by all measures will continue to deny the Child the care and subsistence he needs and deserves. Father's love alone is not sufficient to fulfill the Child's needs for care, control, or subsistence. The court is compelled to conclude that Father is not capable of remedying his parental incapacity to the extent that would enable him to provide essential parental care, control, and subsistence necessary for the Child's physical and mental well-being.

Trial Court Opinion, 5/24/23, at 26-27.

The record supports the orphans' court's decision. For example, the Agency presented testimony from the aforementioned evaluator, Dr. Lisa Jannetta, who the trial court accepted as an expert in psychology and parenting capacity. N.T., 12/1/22, at 8-11. Dr. Jannetta evaluated Father on October 14, 2021, and prepared a 13-page report. ***Id.*** at 12-13; Agency's

Exhibit 2. According to Dr. Jannetta, Father suffered from post-traumatic stress disorder and hallucinations. *Id.* at 19. Dr. Jannetta expressed concerns that Father

> had substantial issues with crystal meth through his 20s that others deemed to be problematic, and he also used it to help manage his moods, plus [Father has a] criminal history that involves drug use, selling.
>
> … [Father also has an] extensive [] history of incarceration. Also[, Father] deni[es] responsibility regarding his behaviors. He blames others and has no remorse for his actions. [Father demonstrates a] failure to conform to social norms regarding his [un]lawful behaviors as demonstrated by his legal issues.

*Id.* at 20-21.

Dr. Jannetta noted that Father "reported [having] 13 up to, maybe, possibly 26 children with different women and there seems to be a lack of commitment to them and to the relationships." *Id.* at 22. Dr. Jannetta stated:

> Father seems to have difficulty providing for his own basic care. He has a history of homelessness and incarceration, financial instability, and it's not known if he has been able to care for any of his other children's basic needs. I'm not aware of him performing a role as a single parent with any of the rest of his children.

*Id.* at 23-24. Dr. Jannetta specifically stated her concern for Child's safety, because Father "had put himself in unsafe positions as demonstrated by his legal charges and convictions. He may not be the best judge of what is safe for a child." *Id.* at 24.

The Agency's caseworker, Megan Varga, confirmed that Child "came into care after birth and has been [in the Agency's] custody since May 27, 2020." *Id.* at 32. Ms. Varga summarized Father's parenting goals as "mental health,

drug and alcohol, domestic violence, crime-free, parenting, income, housing, and commitment to [C]hild." *Id.* at 34. Ms. Varga noted Father has been incarcerated for all but "approximately four months since [Child's] case began." *Id.* at 41.[2] Father was incarcerated throughout the termination hearings. The Agency's counsel asked Ms. Varga:

> Q:          If [Father] were to be released tomorrow, what would
>             he still have to complete on his plan?
>
> Ms. Varga:
>
>             He would need to complete his mental health, drug
>             and alcohol objectives, the domestic violence,
>             complete the intake evaluation, and follow
>             recommendations for treatment. He would need to
>             obtain and maintain stable housing, obtain and
>             maintain proof of employment, [demonstrate a]
>             commitment to [C]hild, and participate in a parenting
>             program.

*Id.* at 52.

Upon review, we discern no error or abuse discretion by the orphans' court in finding that the Agency established grounds for termination under Section 2511(a)(2). Although Father argues he was progressing with his

---

[2] Ms. Varga explained that Father was incarcerated on July 9, 2020, as a result of numerous drug charges. N.T., 12/1/22, at 34. Father was also charged with criminal mischief, resisting arrest and escape, and four summary offenses. *Id.* at 35. Father was released on July 31, 2020, but incarcerated again from August 13, 2020 to October 4, 2021. *Id.* On January 26, 2022, Father was incarcerated, and has remained incarcerated, as he is serving a three to seven year prison sentence. *Id.* at 41.

parenting objectives in prison, and should be allowed additional time to complete the objectives, Child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The orphans' court properly concluded that Father's repeated and continued incapacity to parent has caused Child to be without essential parental care, and the conditions and causes of Father's incapacity cannot or will not be remedied. *See* 23 Pa.C.S.A § 2511(a)(2).

<u>Section 2511(b) - Needs and Welfare</u>

Father also challenges the orphans' court's termination of his parental rights under 23 Pa.C.S.A. § 2511(b). When the court finds grounds for termination under Subsection 2511(a), it must then consider Child's needs and welfare:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. ...

23 Pa.C.S.A. § 2511(b).

This Court has stated repeatedly that intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The court "must also discern the nature and status of the parent-

- 10 -

child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However,

> **the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case**.
>
> Importantly, **the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship**.

*In re A.H.*, 247 A.3d at 444–45 (citations omitted, emphasis added).

Father argues the Agency failed to prove, by clear and convincing evidence, that termination of his parental rights is in Child's best interests. In support, Father cites his testimony that Child is happy to see him. Father's Brief at 32. Father also cites Ms. Varga's testimony that Father was "very engaged" with and "interested" in Child. *Id.* at 33.

The Agency counters that because of Father's actions, Child has been in the Agency's care for his entire life. The Agency emphasizes that Child views his foster parents "as Mom and Dad, [and Child] is comfortable around them and seeks them out for comfort." Agency's Brief at 11.

Child's guardian *ad litem* states:

In this specific case, [C]hild has just turned three years of age. Throughout the case, [C]hild has NEVER lived with Father. Father's visits (most of which were virtual, due to Father's incarcerations) went "well." These brief and sporadic visits cannot possibly [give] rise to the conclusion that there is a measurable or meaningful bond between [C]hild and Father. [C]hild has not had a biological father figure since his birth in May 2020 - the resulting bond with the biological father is attenuated. [C]hild does not identify Father as a parent and termination of Father's parental rights would not harm [C]hild as there does not appear

- 11 -

to be a positive or significant bond that meets the developmental, physical and emotional needs of [C]hild.

[C]hild has been in care his entire life – three years. [C]hild is comfortable and well cared for in his resource home. [C]hild's resource home has been, and will continue to be, the foundation of his emotional well-being, care and development. This is a pre-adoptive home and will provide [C]hild with permanency, love, comfort, security and safety.

GAL's Brief at 7-8.

The GAL's argument mirrors the rationale of the orphans' court. The

orphans' court explained:

At this time, the Child has just turned three years of age. It is notable that throughout the case, Father's visits with Child (many of which have been virtual) have "gone well." The court itself has had many virtual contacts with Father, and can fairly state that Father is engaging, pleasant, and even entertaining at times. The Child may well have had similar perceptions about Father. However, the Child's favorable reactions to Father and Father's attentiveness to the Child during their sporadic and brief contacts cannot possibly give rise to the conclusion that there is a measurable and meaningful bond between the Child and Father. This is not a situation where a child has resided with a parent under that parent's care and has learned to look to that parent to meet the child's physical and emotional needs but then is removed and longs for the parent.

By contrast, the Child is comfortable and well cared for in the resource home. The resource parents have indicated their willingness to adopt the Child. The Child is bonded to the resource parents, whom he refers to as "Mom and Dad." The resource parents are meeting all of the Child's needs - developmental, physical, and emotional. The Child deserves a nurturing, loving, and stable home. He has found that home with his resource parents. There is no doubt that the Child's welfare is served by his remaining with his resource parents and his eventual adoption by them.

Trial Court Opinion, 5/24/23, at 30.

The record again supports the orphans' court's findings. Ms. Varga testified that Father had virtual visits with Child, "every other week for 15 minutes," which "went well." N.T., 12/1/22, at 50-51. She also testified that Father visited with Child in person during the times when Father was not incarcerated. *Id.* at 51.

However, Ms. Varga also testified about Child residing "in a traditional resource home" for adoption by his foster parents. N.T., 12/1/22, at 31, 54. Child has lived with the family since February 23, 2022. *Id.* at 53. Ms. Varga stated that Child was doing "very well." *Id.* Child refers to his foster parents as "Mommy and Daddy." *Id.* Ms. Varga described Child's foster parents as "appropriate" and "encouraging," and observed that they "provide for [Child's] needs and advocate for him." *Id.* at 54.

Consistent with the foregoing evidence, the orphans' court acted within its discretion in considering Child's needs and welfare pursuant to Section 2511(b). As the court did not err, we affirm the termination of Father's parental rights.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/2/2023

- 13 -